# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANTHONY VILLANUEVA and DREW INMAN | Crim. Action No.: 3:19-cr-00292-PGS<br><br>**MEMORANDUM AND ORDER** |

Following a five-day trial and five days of deliberations, the jury returned a verdict of not guilty on all counts as to Defendant Anthony Villanueva ("Villanueva") and a partial verdict as to Defendant Drew Inman ("Inman"). Of the two counts against him, the jury found Inman not guilty on Count 4, falsification of records (18 U.S.C. § 1519), but it was deadlock on Count 1, deprivation of rights under color of law (Use of Excessive Force) (18 U.S.C. § 242). Inman now moves for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 arguing chiefly that the Government engaged in prosecutorial misconduct by raising a new argument in its rebuttal summation. (ECF No. 120). More specifically, Inman argues that the Government never disclosed that it was alleging Inman used excessive force by striking Chanzie Washington with a flashlight until its rebuttal during closing arguments, at which point Inman had no notice of the allegation and no opportunity to respond.

1

Although the Court finds that the prosecutor engaged in misconduct by inserting a new argument for the first time on rebuttal, acquittal may not be the appropriate remedy. Instead, for the reasons below, the Court will grant Inman's Rule 29 motion made during trial on May 8, 2023 and acquit Inman as to Count 1 on the basis that the evidence was insufficient to sustain a conviction.

## I.

Although the facts are set forth below, most of the activity was recorded on videos captured by the body worn cameras ("BWC") of the responding Trenton Police Officers on the night of the incident. The videos are shaky, grainy, and lack clarity as they were recorded during nighttime hours. During trial, the Government highlighted numerous segments of the videos due to the quality of the footage.

At or around 2:00 a.m. on April 9, 2017, a cold night, Officers Kanifa Wood and Gloria Garcia of the Trenton Police Department signaled for Chanzie Washington to pull over after having observed him run a red light at the intersection of Prospect and West Hanover Streets. Washington stopped his vehicle but did not place it in park. Just as the officers exited their vehicle, Washington sped away. In the ensuing pursuit, Washington drove at high speeds through residential areas of Trenton and down a one-way road in the wrong direction. Several Trenton Police Officers, including Villanueva and Inman, joined the pursuit.

Eventually, Washington reached Spring Street where he abandoned his vehicle, fled on foot, ran through yards and then jumped into the Delaware and Raritan Canal ("the Canal"). Washington swam across the Canal, climbed out and entered a yard that was enclosed by a fence. Detective Lawrence Davis and Officer Nicholas Mahan were positioned on the opposite side of the fence in a parking lot. Officer Mahan had his gun drawn, and Detective Davis controlled a K9 dog. Officer Nicholas Mahan ordered Washington to show his hands, move forward and climb over a chain-linked fence that separated the officers from Washington.

As Washington began to comply with the orders, Officer Villanueva entered the yard on the same side of the fence as Washington and seemingly punched Washington causing him to fall to the ground. Video footage shows Villanueva punching Washington; and Inman arriving immediately thereafter and tackling and then punching Washington.[1] Washington can be heard on video crying out "You've got my hands" and "Stop hitting me in my face." Washington was eventually handcuffed by Officer Mahan and transported to the Trenton Police Headquarters. Washington was later charged with resisting arrest by flight and obstruction.

On April 18, 2019, a federal grand jury indicted Villanueva and Inman in connection with the April 9, 2017 incident. As it pertains to Villanueva, the operative

---

[1] It is at this point that the Government asserted that Inman struck Washington with his flashlight (mechanical force) in its rebuttal argument. The video shows an image of flash, but an object (flashlight) is not clearly seen. The video is dark and blurry.

Indictment contains one count for deprivation of rights under color of law in violation of 18 U.S.C. § 242 (Count 1) and two counts for falsification of records in violation of 18 U.S.C. § 1519 (Count 2 and 3).[2] (ECF No. 133). As to Inman, the Indictment contains one count for deprivation of rights under color of law in violation of 18 U.S.C. § 242 (Count 1) and one count for falsification of record in violation of 18 U.S.C. § 1519 (Count 4). (*Id.*). In sum, the Government charged defendants with violating Washington's Fourth Amendment right by using excessive force to affect a seizure and filing false police reports concerning the incident. As to defendants' alleged use of excessive force, the Indictment reads:

### The April 9, 2017 Assault of CW

2.      On or about April 9, 2017, at approximately 2:00 a.m., defendant VILLANUEVA responded to a radio call for assistance, alerting him that other officers were in pursuit of a suspect, later identified as CW, who had fled in his vehicle, attempting to avoid a routine traffic stop near an intersection in Trenton.

3.      VILLANUEVA and other officers soon spotted CW abandoning his vehicle and fleeing on foot. VILLANUEVA and other officers therefore exited their vehicles and pursued CW on foot.

4.      After leading the officers on a foot chase for approximately one to two minutes, CW reached the banks of the Delaware and Raritan Canal, got into the water, and swam across to the opposite bank. CW then exited the

---

[2] The original Indictment (ECF No. 1) contains two additional charges against Villanueva which were severed by order of the Court on September 17, 2019. (ECF No. 20).

canal by climbing up a steep embankment and into a brush-strewn area near a parking lot.

5.      A chain link fence separated the brush-strewn area adjacent to the canal from the parking lot. As CW exited the canal and walked towards the chain link fence, Police Officer 1 stood on the opposite side of the fence, in the parking lot. Additional Trenton police officers who had arrived on the scene ordered CW to put his hands in the air. CW complied, raising both hands in the air above his head. Police Officer 1 ordered CW to climb over the fence toward Police Officer 1. Again, CW complied. CW placed both hands on top of the chain link fence.

6.      Defendant VILLANUEVA was standing on the same side of the chain link fence as CW, and nearby CW, as CW complied with Police Officer 1's commands.

7.      Nonetheless, and without issuing any warning or command, defendant VILLANUEVA moved swiftly towards CW and punched CW in the face.

8.      Simultaneously, defendant INMAN, who had been approaching CW from behind, tackled CW to the ground. Defendant INMAN did not issue any warning or command prior to tackling CW.

9.      During the next approximately thirty seconds, defendant INMAN and defendant VILLANUEVA punched CW numerous times. CW cried out in pain, and told officers, "stop hitting me in my face," and "you've got my hands."

10.     CW was subsequently handcuffed by other officers on the scene, and driven to Trenton Police Headquarters for processing. Defendant VILLANUEVA assisted in processing CW, and was present when CW's booking photograph was taken within a few hours of CW's arrest. The booking photograph depicts various injuries to CW's

face; namely, a bloody lip and nose, and swelling and bruising around his left eye.

(ECF No. 133, ¶¶ 2-10).

The Indictment contains no mention of Inman's use of a flashlight as a means of inflicting force.

## II.

A jury trial commenced on May 1, 2023. In the Government's opening statement, the Assistant United States Attorney ("AUSA") described the incident as follows:

> Officer Villanueva ran up and sucker punched Washington as he had his hands on the fence. While that was happening, Officer Inman came in from behind and tackled him. The two officers then punched Washington repeatedly as he was laying on the ground screaming in pain, all to punish Mr. Washington for running.

(T: 31:22-32:2).

The AUSA further stated in his opening:

> When Washington is trying to climb the fence, Inman yells, no, I've got him and runs in from behind to tackle him. As that's happening, Villanueva runs toward Washington and punches him square in the face. They're not trying to arrest him, they're trying to punish him.

(T. 34:8-13).

As to Washington's testimony, the AUSA informed the jury of the following:

> [Y]ou're going to hear from Mr. Washington, who's going to tell you why he ran, why he swam. And that he was

> complying when he was sucker-punched by Villanueva
> and when he was tackled by Inman, and he was giving
> them his hands as they were punching him on the ground.

(T. 37:23-38:2).

During the opening statement, the AUSA played to the jury the video from Officer Maria Paccillo's BWC, which the Government referred to as the video that "most clearly captured" the occurrence. (T. 36:15-23). The prosecutor never made any argument that Inman punched Washington with a flashlight, as a means of inflicting excessive force, or referred to any evidence of same.

In its case-in-chief, the Government presented evidence that included, among other things, the use-of-force training that the defendants received and several videos from the BWCs of officers who responded to the incident. Stephen Notta, the Government's first witness, trained Villanueva and Inman at the Mercer County Police Academy. Notta testified about the use-of-force training and Attorney General Guidelines that he taught to the defendants. On the use of force, Notta testified that "[i]n addition to a reasonable belief that force is immediately necessary, the force must be reasonable." (T. 101:17-18). Notta further testified that when undertaking an arrest, it is essential for the officer to handcuff both hands of the subject in order to gain custody and control and prevent an attack. (T. 107:6-15; 125: 5-14). Relying on the Supreme Court Case, *Graham v. Connor*, 490 U.S. 386, 388, 109 U.S. 386, 104 L.Ed.2d 443 (1989), Notta instructed trainees that an officer's use

of force "will be judged from the perspective of a reasonable person on the scene at the time the force is used, rather than with 20/20 vision of hindsight." (T. 102:7-12). Notta further testified on the reasonable levels of force a police officer may use in accordance with the Attorney General guidelines. The levels of force include: constructive authority (T. 103:5-11); physical force, which "goes above routine and procedural contact" and can be used "when it's necessary to overcome the subject's physical resistance to the exertion of the law enforcement authority" (T. 103:14-21); mechanical force, which "involves a device or substance, baton, flashlight, OC spray" (T. 103:22-25); and finally, deadly force. (T. 104:3-4).

Notta testified that he instructed students that "the use of force options should not be viewed as a continuum, a stepladder." (T. 104:7-8). Rather, "officers' actions are always based on, in large part, the actions of the subject that they are trying to arrest." (T. 104:15-17). The "reasonable force options" that an officer may utilize depend on the totality of the circumstances. (T. 108:24-109:20).

In addition, Notta taught trainees that the use of a flashlight was considered mechanical force. More specifically, he testified to the following:

> Q. Were they taught specifically a baton or any object could be used as mechanical force?
> A. Any object could be used. If you strike somebody with your handcuffs, that's mechanical force.
> Q. Flashlight?
> A. Flashlight, mechanical force.
>
> (T. 93:3-8).

8

On the third day of trial, the Government called Lieutenant John Harbourt and Chanzie Washington to the stand. Lieutenant Harbourt provided training at the Trenton Police Department. (T. 320:7-18). On cross, the following testimony concerning mechanical force was elicited:

> Q. With regard -- do you give training on the use of OC spray?
> A. I do.
> Q. And that's mechanical force?
> A. It is.
> Q. Is that a higher level than a physical force?
> A. It is.

(T. 358:10-16).

During Washington's testimony, the prosecutor played and intermittently paused parts of videos captured by the BWCs of different officers who responded to the scene. After having been tackled, Washington testified that he was "on the ground facedown . . . getting punched." (T. 391:1-3). The AUSA asked Washington to describe the events on the video, and Washington testified as follows:

> Q. What is happening here?
> A. Now he has me covered with his leg and he's punching me in the face. And this other officer is stepping on my -- stepping on my hands and he's, like, kicking. And there's another one on the other side and he's, like, laying on me, and they're pumping me -- he's punching me.
> Q. When you say "he" -- you used "he" a lot. So who's punching you at this time?
> A. Inman.

(T. 391:15-23).

The following exchange then took place:

> Q. Now, we just saw an officer appear to punch you on this video. Do you see that?
> A. Yes.
> Q. Do you know who that officer was?
> A. Yes.
> Q. Who is that?
> A. Edman -- Inman.
> Q. Did that punch land?
> A. Yes.
> Q. Where did he hit you?
> A. Near my back, lower spine.
> Q. Did it hurt?
> A. Yes.
> Q. Did it feel like he hit you with anything in his fist?
> MR. KRASNY: Objection, Your Honor. May we be heard?
> THE COURT: You may.

(T. 393:6-21).

At sidebar, Inman's counsel objected to the leading questions. The Court instructed the prosecutor to rephrase. The following exchange then took place:

> Q: When you were punched, did it hurt?
> A: Yes.
> Q: What did it feel like?
> A: It felt like I was hit with something that wasn't human.
> Q: What do you mean by that?
> A: It was solid when it hit my bone.

(T. 395:16-21).

The AUSA's examination of Washington contained no mention of a flashlight thereafter. The jury also heard testimony from Officer Mahan who was at the

10

location where Washington climbed out of the Canal and entered the fenced yard. Officer Mahan ordered Washington to show his hands, move toward him and climb a chain-linked fence that separated Officer Mahan from Washington. (T. 616-622). Washington put his hands in the air, moved toward Officer Mahan and placed his hands and a foot on the fence. (T. 620:22-622:21). As Washington appeared to climb the fence, officers tackled Washington to the ground and struck him. (T. 622:22-623:25). Officer Mahan testified that from a few feet away on the opposite side of the fence, he observed what he repeatedly described as a "struggle" between officers and Washington. (T. 623:9-15; 625:6-626:2). Officer Mahan testified to the following:

> Q. Did you see Anthony Villanueva throw any punches
> at Chanzie on the ground?
> A. I wouldn't be able to answer that yes or no. All I could
> see was a struggle. There was no clear picture of
> anything else being done, other than a struggle between
> officers and Mr. Washington.
> Q. Did you see Officer Inman throw any punches at Mr.
> Washington?
> A. That's the same answer. I didn't see anything other
> than a struggle between officers and Mr. Washington.

> (T. 626:3-12).

With the assistance of another officer, Officer Mahan handcuffed Washington. (T. 627:13-628:19). On cross-examination, Officer Mahan testified that he had doubts as to whether Washington would comply with the command to climb over the fence, and that at one point, Washington put his foot on the fence but

11

then removed it and looked left and right. (T. 645:22-646:8). Although Officer Mahan eventually placed his firearm back in its holster, he did not rebuckle the holster or remove his hand from his firearm because Washington remained a potential threat and he was uncertain whether Washington would come over the fence and surrender. (T. 647:8-648:10).

The Government rested its case on May 8, 2023. Shortly after, counsel for both Villanueva and Inman moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. The Court reserved judgment until after the completion of the trial. (T. 687:14-24). The defense rested that same day without calling any witnesses or presenting any evidence. (T. 696:2-9).

In her closing statements, the AUSA described a scene where Villanueva threw the first punch and Inman subsequently tackled Washington and punched him twice while he was on the ground. (T. 696-697; 714-715; 717-718; 731-732; 740). In particular, the AUSA contended that after Washington "surrendered," Inman and Villanueva "wanted more." (T. 696:19-24). At that point, the AUSA asserted:

> [T]hat is when Anthony Villanueva came in and blindsided Chanzie Washington with a punch to the head. That's when Drew Inman came in and tackled him from behind. And when he was on the ground, the beating did not stop.
>
> (T. 696:23- 697:1).

\*\*\*

12

> That is when Drew Inman delivered two calculated, strong blows to Chanzie's body -- because these officers wanted more than an arrest. They wanted to punish Chanize Washington for driving away from that motor vehicle stop. They wanted to get revenge for having to have chased him through a couple backyards, and they wanted to exact retribution for the fact that this man jumped in that canal. So they beat him.

(T. 697:8-15).

The AUSA brought up Inman's flashlight at one point and stated "[w]e know that he's [Inman's] shining his flashlight on Chanzie Washington from back there and he's talking to him [Washington]. (T. 710:18-25). He [Inman] says 'Hey, get over here.' He [Inman] says, 'He's [Washington's] right there.'" (T. 710:18-711:1).

Later, the AUSA recounted the incident again, but this time she asserted that the punch by Villanueva and the tackle by Inman occurred "at the same time." (T. 714:8-16). The AUSA advised the jury to split the incident into "two scenes" – the "take-down" and the "on the ground" assault. (T. 714:17-715:7). AUSA Nye further stated "Once he's [Washington's] on the ground, Drew Inman punches him twice, hard, calculated." (T. 715:6-7). The AUSA never mention the use of a flashlight as a mean of inflicting force upon Washington.

On rebuttal, the AUSA argued – for the first time – that Inman used his flashlight to hit Washington. The relevant portion of the Government's rebuttal is recited below.

Ms. Nye: Then we have Officer Inman and the two punches. I said they were calculated, and they were. These were not, as defense suggested, these split-second decisions; they were thought about. He wanted to punch him like this. Can we go to slide 13, please. I am going to ask you to watch this video closely. This is video 114. Do you remember we talked about the types of force you can use?

Mr. Krasny: Objection.

The Court: On what basis?[3] All right. You may continue.

Ms. Nye: There is constructive force, there is physical force, there's mechanical force. You were told mechanical force is the use of an object in the course of committing this force. Watch Officer Inman's right hand. As he gathers for that second punch, I submit to you that this video shows he has his flashlight in his hand, that he is using the flashlight when he punches Chanzie Washington. So when Chanzie Washington cries out in pain, you can believe it.

(Recording played.)

Ms. Nye: You will have this video and you can watch it, but the video is clear. You see the reflective end of the flashlight in Officer Inman's hand. I will play it one more time, but you can watch it on your own.

(Recording played.)

(T. 812:17-813:17).

As this argument was made, the AUSA displayed a PowerPoint slide with a screenshot from the video captured by Officer Paccillo's BWC that showed Inman and other officers huddled over Washington. *See* Exhibit J-4; Government Exhibit 114. The screenshot contained a caption in large font that read "INMAN HIT

---

[3] Inman's defense attorney, Mr. Krasny, did not verbally reply, however, I recall that he shrugged his shoulders in response.

CHANZIE WITH FLASHLIGHT." The defense objected at the time the slide was shown to the jury but provided no basis therefor.

At the conclusion of closing arguments, the Court heard counsel at sidebar. Inman's counsel objected to the prosecutor's rebuttal argument concerning the alleged use of a flashlight to strike Washington and requested that the Court instruct the jury to disregard the statement entirely. (T. 814:3-820:1). The Court expressed concern over the appropriateness of the comment and invited counsel to submit curative instructions. (T. 821-832).

The next day, Mr. Krasny renewed his application for a jury charge that would instruct the jury that the prosecutor's argument concerning Inman's use of a flashlight was not evidence.[4] (T. 839:20-843:2). The Court denied the proposed charge, and instead, provided the following curative instructions in its final charge to the jury:

> The following are not evidence:
>
> …
>
> (2) Statements and arguments of the lawyers for the parties in this case including the prosecutors' rebuttal argument on Exhibit 114.

Jury Instructions, at 5.

---

[4] Mr. Krasny did not request an opportunity to supplement his closing or to reopen testimony to present further evidence.

The Court reasoned that the instructions struck a balance that called out the prosecutor's argument regarding Exhibit 114, the BWC video from which the screenshot was taken, but did not draw further attention to Inman's alleged use of a flashlight. (T. 843:3-844:3).

After the case was submitted the jury on May 9, 2023, the Court heard argument on Defendants' Rule 29 motion. (T. 894-897). The Court indicated that it would render a decision on the motion that day, but it did not do so.

On May 15, 2023, the jury sent a communication, which stated that the jury had reached an "irreconcilable impasse regarding one of the counts . . . ." *See* Jury Communication No. 6 (ECF No. 127). The communication further stated "Jury is unanimous in the belief that additional deliberations will not resolve the impasse." *Id.* Subsequently, the undersigned gave the jury an *Allen* charge (*Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896)), that directed the jury to continue deliberations in an attempt to reach a unanimous verdict. Later that same day, the jury sent the Court another communication which advised that a verdict had been reached for certain counts but that the jury remained at an impasse regarding the charge for deprivation of rights under color of law against Inman (Count 1 #2). *See* Jury Communication No. 7 (ECF No. 129). The communication also stated "The jury reiterats [sic] the position that additional deliberation will not resolve the impasse." *Id.* The Court questioned the jury foreperson and polled each juror

individually in open court on whether there was a hopeless deadlock that could not be resolved by further deliberations. Each member of the jury responded in the affirmative. The Court declared a mistrial as to Count I against Inman and discharged the jury. The jury found Villanueva not guilty on all counts.

## III.

Inman moves for a judgment of acquittal on the basis that the prosecutor's comment deprived him of a fair trial because the prosecutor argued – for the first time in rebuttal – that Inman deployed a flashlight to punch Washington. In support, Mr. Krasny, on behalf of Inman, points to the not guilty verdict that the jury returned as to Villanueva, whose actions the Government portrayed as "more egregious" than Inman's actions during the trial.[5] Additionally, Inman contends that the evidence was insufficient to sustain a conviction of Count 1.

### A. Prosecutorial Misconduct

Federal Rule of Criminal Procedure 29.1 sets forth the order of closing arguments. Under this rule, the Government closes first, the defense closes second, and the Government may rebut. Fed. R. Crim. P. 29.1. This sequence recognizes that "fair and effective administration of justice is best served if the defendant knows the arguments actually made by the prosecution in behalf of conviction before the

---

[5] At oral argument, the Government countered that it equally developed the charges against both defendants. From my perspective, the direct evidence focused more on Villanueva than Inman.

defendant is faced with the decision whether to reply and what to reply." Fed. R. Crim. P. 29.1 Advisory Committee Note 1974 Addition. The Government is afforded the final say because "the prosecution is at a clear procedural disadvantage insomuch as it bears the burden of proof beyond a reasonable doubt at a criminal trial . . . ." *Abdur-Raheem v. Off. of Att'y Gen.*, No. CV2020355MASDEA, 2021 WL 5122076, at *2 (D.N.J. Nov. 3, 2021).

A defendant's right to a fair trial, including the right to be free from prosecutorial misconduct, is guaranteed by the Due Process Clause of the Fifth Amendment. *See United States v. Welshans*, 892 F.3d 566, 574 (3d Cir. 2018). The analysis for whether a prosecutor committed misconduct consists of two steps. *Id.* First, the Court considers "whether there was misconduct." *Id.* If the answer is yes, then the court proceeds to determine "whether that misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process, taking into account the entire proceeding." *United States v. Repak*, 852 F.3d 230, 259 (3d Cir. 2017) (internal quotation marks and citation omitted). In conducting this analysis, the court "must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001). "As a general rule, Government counsel should not be allowed to develop new arguments on rebuttal, but should be restricted

to answering the arguments put forth by defense counsel." *United States v. Brown*, 765 F.3d 278, 296 (3d Cir. 2014) (vacating judgment of the district court and remanding for a new trial where prosecutor's remarks during rebuttal summation inserted facts not in evidence) (internal quotation marks and citation omitted). In rebuttal, the prosecution "may explain why it has not proven certain facts or respond to the interpretation which the defense has placed on its failure to present evidence, [but] it may not use the defense's comments to justify the reference to facts or the assertion of claims which it could have, but did not, introduce at trial." *Id.*; *see United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989) ("[I]t is improper to base closing arguments upon evidence not in the record.").

Here, the prosecutor's argument that Inman deployed a flashlight to strike Washington was not made until rebuttal. The Indictment, the Government's pretrial submissions, and the AUSA's opening statements made no mention of Inman's use of mechanical force or a flashlight to strike Washington.[6] Throughout the trial the prosecutors painted a scene that depicted Inman as having employed physical force to punch Washington. The evidence contained no direct reference that Inman used a flashlight to punch Washington. Testimony regarding defendants' use of force

---

[6] To speak with candor, the prosecutor's remark that Inman employed mechanical force (by punching Washington with a flashlight) rather than physical force (by punching Washington with his fist) to inflict excessive force surprised me. It was not alleged in the Indictment, raised in the opening argument, or reasonably inferred from the evidence presented at trial.

training at the police academy focused specifically on physical force. (T. 727:8-730:1). A flashlight was mentioned during the Government's case, but the flash of a light was not identified by any witness as coming from Inman's flashlight or a flashlight being employed as mechanical force to inflict excessive force. And although a reflection of a light can be seen in the video captured by Officer Paccillo's BWC, it was not clear whether Inman even held a flashlight at the time he struck Washington or whether the light emanated from a flashlight that Inman held.

Further, in closing, the AUSA argued the following:

> Drew Inman punches him [Washington] twice, hard, calculated.
>
> (T. 715:6-7).
>
> And then there's Officer Inman. At the time he delivers his first punch -- and there are two.
>
> (T. 717:11-15).
>
> Each time that Drew Inman punches Chanzie Washington, it is less time that he's using to handcuff him, to grab his hands. He could have been doing that. Instead, he's punching him for no purpose.
>
> (T. 717:17-20).
>
> Watch as Drew Inman cocks his elbow back and delivers this strike to Chanize Washington's body.
>
> (T. 717:22-25).
>
> Officer Inman punches him twice. The testimony was that Officer Inman punched him in his side. The punches are as clear as day.

(T. 731:24-732:5).

Drew Inman punched Washington twice while Washington cried out in pain and begged him to stop.

(T. 740:14-15).

In connection with the elements required to be proven for Count 1, the prosecutor referred to the fourth element as "whether the physical force led to an unnecessary injury." (T. 705:12-13). In short, there simply was no mention or implication of a flashlight or the use of mechanical force by either defendant.

The Government contends that the defense's closing arguments pertaining its characterization of the Attorney General Guidelines on use of force and the portrayal of Washington as a "con man" and "liar" invited the prosecutor's rebuttal theory that Inman hit Washington with a flashlight under the "invited response" doctrine. The Court disagrees. Under the invited response doctrine, "reasonable response[s] to improper attacks by defense counsel" are permissible. *See United States v. Wood*, 486 F.3d 781, 788 (3d Cir. 2007) (internal quotation marks and citation omitted). The invited response doctrine has generally been found to be "applicable only in instances where the prosecution team was attacked for reasons unsupported by the evidence at trial." *Id.* at 788. As expected, defense counsel's closing statements consisted of arguments that the force used by Inman was reasonable based on the training that was provided and the guidelines that were taught to police officers. Such

remarks directly responded to the Government's contention that Inman used excessive force, a key issue in the case. Similarly, the defense's characterization of Washington as a "con man" and "liar" is too attenuated to justify the insertion of a new theory on the use of force that the Government could have, but did not, argue earlier. Such remarks also bore on Washington's credibility. No reasonable inference can be drawn that the defense's closing opened the door for the prosecutor's statement in rebuttal summation.

Moreover, the Government's position is further refuted by the fact that the prosecutor had prepared a PowerPoint slide with the caption "INMAN HIT CHANZIE WITH FLASHLIGHT" that was displayed to the jury for the first time during rebuttal. The Government contends it only displayed the slide after the defense invited the response. Even if one believes that excuse, it does not legitimize the use of the flashlight on rebuttal when notice of same was never provided. For all these reasons, the Court finds that the prosecutor's comment amounted to misconduct.

The more challenging inquiry is whether the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Repak*, 852 F.3d at 259 (internal quotation marks and citation omitted). Here, the improper statement was made in the first instance on rebuttal when the defense lacked an opportunity to respond. The statement, coupled with the PowerPoint slide, had the

22

effect of inflaming the jury who had heard from the start of the trial that Inman employed physical force to punch Washington. In the Court's view, the timing and nature of the statement had a lingering effect that permeated jury deliberations with prejudice. *See United States v. Holmes*, 413 F.3d 770, 776 (8th Cir. 2005) ("The potential for prejudice is great during closing arguments, especially when the defense has no opportunity for rebuttal.").

Moreover, the evidence presented against Villanueva and Inman as to Count 1, suggests that the prosecutor's comment influenced the outcome of the trial and prejudiced Inman. The Indictment and the entirety of the Government's case up to its rebuttal casted both defendants as having used excessive force to beat Washington. The only critical difference that can be discerned with respect to each defendant is the prosecutor's improper comment in rebuttal. The Court has reviewed the footage captured by Officer Paccillo's BWC several times and notes that while a flash appears at the time Washington is struck, the video is dark, grainy and blurry. No witness identified the light as emanating from Inman's flashlight. In brief, the Government never alleged the use of a flashlight was in play prior to the prosecutor's rebuttal. Taking into account all the circumstances of the case, the Court finds that the prosecutorial misconduct so infected the trial with unfairness as to make the result of the trial a miscarriage of justice and a denial of Inman's right to Due Process.

### B. Inman's Motion for Judgment of Acquittal

The Government correctly notes that the relief for prosecutorial misconduct is a new trial, not acquittal. After the Government rested its case on May 8, 2023 but before the jury returned a verdict, the defense made an oral Rule 29 motion. The Court inadvertently did not issue a ruling then but does so now. *See supra* Section I. In doing so, the Court considers the evidence in its entirety, as well as any inferences that may be drawn therefrom, in the light most favorable to the prosecution. *See United States v. Thompson*, 675 F. App'x 221, 224 (3d Cir. 2017).

Federal Rule of Criminal Procedure 29 governs motions for acquittal. Under Rule 29(b), a court may reserve its decision on a motion for acquittal, proceed with trial, submit the case to the jury and decide the motion "either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict." *See United States v. Lucas*, No. CRIM. 14-52 FLW, 2015 WL 2159320, at *2 (D.N.J. May 7, 2015). Rule 29 further provides, that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). If the jury "failed to return a verdict, the court may enter a judgment of acquittal." Fed. R. Crim. Pro. 29(c)(2).

On a motion for judgment of acquittal, a court "must 'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact

could have found proof of guilty beyond a reasonable doubt based on the available evidence.'" *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (quoting *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002)). The Court "must be ever vigilant not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting our judgment for that of the jury." *United States v. Robinson*, No. 22-1600, 2023 WL 2133184, at *2 (3d Cir. Feb. 21, 2023) (internal quotation marks and citation omitted). A conviction must be upheld if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979) (citation omitted) (emphasis in original); *see United States v. Styles*, No. CR 17-178 (KM), 2018 WL 901718, at *1 (D.N.J. Feb. 14, 2018). A defendant who moves for acquittal bears "a very heavy burden." *United States v. Anderson*, 108 F.3d 478, 481 (3d Cir. 1997) (internal quotation marks and citations omitted).

A conviction of 18 U.S.C. § 242 requires the Government to prove beyond a reasonable doubt that the defendant: (1) acted under color of law, (2) deprived a person of his or her right to be free from unreasonable search and seizure, (3) acted willfully in depriving a person of this right, and (4) caused bodily harm. *See United States v. Lanier*, 520 U.S. 259, 264, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). The Fourth Amendment right to be free from unreasonable searches and seizures

includes the right to be free from unreasonable force. *See Graham v. Connor*, 490

U.S. 386, 388, 109 U.S. 386, 104 L.Ed.2d 443 (1989). In an excessive force case, a

Fourth Amendment violation is analyzed under the objective reasonableness

standard. *Id.* The court must consider the totality of the circumstances and pay

"careful attention to the facts and circumstances of each particular case, including

the severity of the crime at issue, whether the suspect poses an immediate threat to

the safety of the officers or others, and whether he is actively resisting arrest or

attempting to evade arrest by flight." *Id.* at 396. The reasonableness of an officer's

belief as to the appropriate level of force is "judged from the officer's on-scene

perspective, and not in the 20/20 vision of hindsight." *Curley v. Klem*, 499 F.3d

199, 206-07 (3d Cir. 2007) (internal quotations, citations, and alterations omitted).

At trial, the evidence sufficiently established the first element under 18

U.S.C. § 242. On the night of April 9, 2017, Inman was a police officer with the

Trenton Police Department and acted with authority in that capacity.

The second element – whether Inman deprived Washington of his Fourth

Amendment right – is more challenging. The Government's first witness, Stephen

Notta, testified that officers may utilize reasonable force based on the totality of

the circumstances. Officer Nicholas Mahan, the sole witness who testified about

the force used on Washington, could say only that he saw a "struggle" and could

not answer whether he actually saw Inman throw any punches. Testimony elicited

26

from Washington provided that he was tackled, facedown on the ground when he was punched.

The analysis of this factor must take *Graham v. Connor* into consideration. *Graham* instructs that the reasonableness of force must be evaluated based on the totality of the circumstances. The facts and circumstances of this case are as follows. At approximately 2:00 a.m. on April 9, 2017, Trenton Police Officers observed Washington run a red light and signaled for him to pull over. Washington initially did so, but then took off. Officers pursued him through residential streets and in the opposite direction of a one-way road until he eventually abandoned his vehicle and fled on foot. Washington then jumped into a canal and swam across where officers with their guns drawn awaited him. A chain-linked fence separated Washington from those officers. Washington complied with commands to show his hands and move toward the fence shortly before he was tackled and punched by defendants who came from the same side of the fence that Washington stood. The totality of Washington's conduct, which included evading officers by vehicle, foot and then jumping into a canal would lead a reasonable officer to believe that Washington was a serious threat. Although Washington eventually complied with officers' orders after he exited the Canal, the facts remain that Washington had not been searched, the contents on his person remained unknown, several officers pursued him from various points and Officer Mahan, who directed orders at

27

Washington, continued to perceive Washington as a threat or flight risk. Based on the facts known to an officer on-the-scene, without the benefit of 20/20 vision in hindsight, the Court does not find that the force Inman used was excessive under the circumstances. Accordingly, the evidence was insufficient to prove a violation of 18 U.S.C. § 242 beyond a reasonable doubt.

The Court feels compelled to comment further on the prosecutor's remark in rebuttal concerning Inman's alleged use of a flashlight to strike Washington. As noted earlier, the Indictment charges Inman with using physical force to punch Washington. It is utterly void of any charge that Inman used a flashlight or mechanical force. This was an error by the Government that deprived Inman of his right to mount a proper defense because "the functions of an indictment are to apprise the defendant of the charge of which he is accused and to provide protection against reprosecution should an acquittal result." *United States v. Goldstein*, 502 F.2d 526, 529 (3d Cir. 1974); *see Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907 (1974) (stating that an indictment must provide "facts and circumstances as will inform the accused of the specific offence . . . with which he is charged"). The type of force used (physical versus mechanical) was relevant to a key element of the offense. That is, whether the force was excessive under the circumstances. But the argument concerning the use of a flashlight was not made until the prosecutor's rebuttal, at which point there was no opportunity

for the defense to respond. Without being sufficiently informed of the charge against him, Inman was unfairly prejudiced.

Moreover, throughout the course of the trial, all members of the jury were observed to have been attentive and alert in listening to the witnesses' testimony and the attorneys' arguments. The jury appeared thoughtful and engaged during deliberations. Based on these observations, the Court believes that the jury was influenced by the prosecutor's improper comment in rebuttal. Lieutenant Harbourt's testimony established that mechanical force is a greater degree of force than physical force (T. 358:10-16). And though the Government asserted all along that Inman used physical force by punching Washington, its rebuttal argument was a sudden shift in its theory that heightened the degree of force used by Inman, which in turn, further complicated the inquiry into whether the force used was reasonable under the circumstances. From the Court's perspective, the only critical difference concerning the evidence relevant to Count I against Villanueva and Inman is the type of force allegedly used. Whereas, Villanueva was portrayed as having employed physical force in the form of punches to strike Washington repeatedly, Inman was argued to have used both physical and mechanical force in striking Washington twice. But for the prosecutor's comment in rebuttal, one can readily deduce that the jury would have treated Inman like Villanueva.

To be clear, the Court's decision today concludes that the prosecutor engaged in misconduct when she argued for the first time in rebuttal summation that Inman used a flashlight to hit Washington. The remedy for prosecutorial misconduct is a new trial. However, a new trial will not be ordered because the Court grants Inman's motion for judgment of acquittal based on the evidence at the time the motion was made on May 8, 2023, before the jury returned its partial verdict.

## ORDER

Having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented, and for good cause shown, and for all of the foregoing reasons,

**IT IS** on this 11th day of September, 2023:

**ORDERED** that defendant Drew Inman's oral Motion for a Judgment of Acquittal made at trial on May 8, 2023 is **GRANTED**; and it is further

**ORDERED** that defendant Drew Inman's Motion for a Judgment of Acquittal (ECF No. 120) is **DENIED AS MOOT**; and it is further

**ORDERED** that the defendant Drew Inman is acquitted of Count 1, Deprivation of Rights under Color of Law (18 U.S.C. § 242); and

**ORDERED** that the Clerk of the Court shall enter a judgment of acquittal as to defendant Drew Inman on Count 1, Deprivation of Rights under Color of Law (18 U.S.C. § 242).

_____
PETER G. SHERIDAN, U.S.D.J.